RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0057P (6th Cir.)
File Name: 01a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOHN C. BONNELL and
NANCY L. BONNELL,
  *Plaintiffs-Appellees,*

   *v.*

ALBERT LORENZO, WILLIAM
MACQUEEN, and GUS J.
DEMAS,
  *Defendants-Appellants,*

MARK COUSENS,
   *Defendant.*

No. 99-2047

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-71155—Paul D. Borman, District Judge.

Argued: February 4, 2000

Decided and Filed: March 1, 2001

Before: NELSON, COLE, and CLAY, Circuit Judges.

1

―――――――――

**COUNSEL**

**ARGUED:** Hunter L. Wendt, Mt. Clemens, Michigan, for Appellants.   James C. Howarth, Detroit, Michigan, for Appellees.  **ON BRIEF:** Hunter L. Wendt, Mt. Clemens, Michigan, Thomas P. Brady, Jeffrey A. Steele, BRADY & HATHAWAY, Detroit, Michigan, Timothy S. Ferrand, CUMMINGS, McCLOREY, DAVIS & ACHO, Roseville, Michigan, for Appellants. James C. Howarth, Juan A. Mateo, Detroit, Michigan, for Appellees.  Donald J. Mooney, Jr., BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Cincinnati, Ohio, Gerald K. Evelyn, Detroit, Michigan, for Amici Curiae.

   CLAY, J., delivered the opinion of the court, in which COLE, J., joined.  NELSON, J. (pp. 49-51), delivered a separate concurring opinion.

―――――――――

**OPINION**

―――――――――

   CLAY, Circuit Judge.   Defendants, Albert Lorenzo, William MacQueen, and Gus J. Demas, appeal from the order granting Plaintiffs, John C. Bonnell and his wife Nancy L. Bonnell, injunctive relief as to Defendants' disciplinary suspension of John Bonnell from his teaching position at Macomb Community College ("the College"), in this case brought by Plaintiffs for, among other things, violation of John Bonnell's civil rights under 42 U.S.C. § 1983 and § 1985.   This case presents us with the difficult task of balancing the precious First Amendment rights of a professor in the academic setting, against the legal obligation of a college to guarantee the rights of students to learn in an environment free of sexual harassment and hostility. Mindful of the significant import of the respective interests involved, we conclude that the balance tips in favor of the College such that the district court erred in granting the extraordinary relief

have to be reversed.  That being so, and in the absence of clear guidance from the Supreme Court on how *Connick v. Myers* is supposed to be applied in a "mixed speech" case such as this, my preference would be simply to assume the answer to the *Connick* question without undertaking to decide it.  Just as hard cases make bad law, it seems to me that delphic questions can make bad law too.  I prefer to duck such questions when I can.

   That said, I reiterate my complete agreement with the outcome announced here.  This, as I see it, is a case where the legitimate interests of the employer far outweigh those of the employee, and the decision to reverse the injunction granted by the district court certainly seems correct to me.

The record before us makes it evident, I believe, that Professor Bonnell was not speaking "as a citizen" in the ordinary sense of that term. He was speaking, rather, "as an employee" with an absorbing personal interest in his raunchy classroom rhetoric, in his disgusted student's demand that he be fired immediately, and in his own professional survival.

It would not be accurate to say, however, that Professor Bonnell confined himself to matters "only" of personal interest. The professor seems to believe in the virtue, if that is the word, of what Senator Moynihan called "defining deviancy down." Professor Bonnell further believes that his status as an intelligent and articulate academician and a "fine teacher"[1] means that the people who pay his salary have no right to require him to eschew scatological and sexual vulgarity that is not germane (at least in the view of those whose job it is to represent the taxpayers) to the content of the course he has been hired to teach. These and related beliefs to which Professor Bonnell adheres are argued forcefully in his "Apology" – and whatever the merit of these somewhat curious beliefs, it seems to me that the Apology does touch on matters of public concern.

If our disposition of the appeal had necessarily turned on our answer to the question whether Professor Bonnell was speaking "as a citizen" upon matters of public concern, I should probably have swallowed hard – thinking uncharitable thoughts about the nature of the assignment given us – and answered in the affirmative. As it happens, however, the outcome of the appeal would be no different if we answered the question otherwise – if we held, *i.e.*, that Professor Bonnell was speaking "as an employee" upon matters only of personal interest. Either way, given the inevitable result of our balancing of the parties' respective interests under *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), the order granting a preliminary injunction would

---

[1]The quoted evaluation of Professor Bonnell's pedagogy comes from Bonnell himself. We have no reason to doubt the accuracy of his self-assessment.

of a preliminary injunction under the specific facts of this case. We therefore **REVERSE** the district court's order.

## BACKGROUND

Plaintiff has taught English Language and Literature at the College since the Fall of 1967. Plaintiff is a member of the Macomb Community College Faculty Organization ("MCCFO") and is employed pursuant to a Collective Bargaining Agreement ("CBA").[1]

In a memorandum dated February 19, 1998, entitled "Obscene and vulgar language in classroom," MacQueen informed Plaintiff that the parent of one of Plaintiff's students (not the complainant in the instant case) had filed a letter of complaint against him based upon a handout that Plaintiff had circulated to the members of his class. The handout, entitled "My Semester Overview," is actually a review of Plaintiff's class prepared by one of Plaintiff's former students in 1991. The handout, as quoted in the memorandum, states as follows:

> "Next, the language that was used during the first four weeks or so of class, in my opinion, was very inappropriate and distasteful. Never before have I encountered an English teacher who used the word "fuck" so openly and so frequently in a classroom discussion. In addition, the use of words such as "pussy" and "cunt" are simply uncalled for and very offensive to

---

[1]We shall make reference to "Plaintiff" in the singular throughout this opinion, inasmuch as John Bonnell is the Plaintiff against whom disciplinary action was taken, while Plaintiff Nancy Bonnell's claims are all derivative of John Bonnell's claims.

Defendant Albert Lorenzo is being sued individually and as President of the College; Defendant William MacQueen is being sued individually and as Vice President for Human Resources at the College; Defendant Gus J. Demas is being sued individually and as Dean of Arts and Science at the College; Defendant Mark Cousens is an attorney for the College's union, Macomb Community College Faculty Organization, and is not a party to this appeal.

many, including me.  I really feel that language such as this is very degrading to women."

(J.A. at 101.)  MacQueen went on to inform Plaintiff that "[a]lthough I do not know the context in which these words are used, I am concerned that your use of such language in the classroom will give rise to a claim of sexual harassment on the theory that this language creates a hostile learning environment for women.  Simple knowledge of your past use of this language places the College under a legal duty to investigate whether you are creating a hostile learning environment."  (J.A. at 101.)  Accordingly, a meeting was scheduled with Plaintiff, his MCCFO representative, and MacQueen, Dr. Ruth Reed, James Van Eman (the College's General Counsel), and Margaret MacTavish (the College's Affirmative Action Officer), for February 26, 1998 to investigate the matter.

Plaintiff agreed to the meeting and defended his use of such language.  Plaintiff maintained that none of the terms at issue were directed to a particular student and were only used for demonstrating an academic point.  Plaintiff claimed that he used the terms to "point out the chauvinistic degrading attitudes in society that depict women as sexual objects, as compared to certain words to describe male genitalia, which are not taboo or considered to be deliberately intended to degrade."  (J.A. at 30.)

The February 26, 1998, investigation concluded with MacQueen issuing a warning to Plaintiff via a memorandum dated March 4, 1998, entitled "Obscene and vulgar speech," which states in relevant part:

This memorandum will confirm my verbal warning to you concerning your use of obscene and vulgar language in the classroom. . . .

Unless germane to discussion of appropriate course materials and thus a constitutionally protected act of academic freedom, your utterance in the classroom of such words as 'fuck,' 'cunt,' and 'pussy' may serve as a

_____

## CONCURRENCE

_____

DAVID A. NELSON, Circuit Judge, concurring.  I concur in the judgment and in much of the court's opinion.  I am somewhat ambivalent, however, about our holding that the acts of insubordination committed by Professor Bonnell in publicizing his student's sexual harassment complaint – a breach of confidentiality against which he had repeatedly been warned – like his promiscuous broadcasting of the screed in which he sought to justify both the classroom recitals of his own sexual escapades and the apparently gratuitous use of coarse language in the classroom, rose to the level of speech in which the professor was expressing himself "as a citizen" on "matters of public concern."

The matters in question were obviously of intense concern to Professor Bonnell himself.  As Bonnell explained in his *apologia*, he "tend[s] to get a tad defensive when people don't just disagree with me, my values, my behavior, but who [sic] would also campaign for and delight in my utter destruction."  The professor was clearly not disposed to let himself be destroyed without a fight.

But an employee against whom disciplinary proceedings are brought for speaking on matters of personal concern is not always entitled to claim the highest degree of First Amendment protection for his speech.  The key determinant of the type of protection extended to employee speech, as I understand what the Supreme Court held in *Connick v. Myers*, 461 U.S. 138 (1983), is whether the employee speaks "as a citizen upon matters of public concern" or speaks "as an employee upon matters only of personal interest . . . ."  *Id*. at 147.  The dichotomy between "citizen" and "employee," in this formulation, seems no less pertinent than the dichotomy between "public concern" and "personal interest."

**CONCLUSION**

The district court's order granting Plaintiff's motion for a preliminary injunction was based upon clearly erroneous findings of fact and an erroneous application of the law. In conducting the appropriate analysis, we hold that a balance of the four preliminary injunction factors weighs in favor of the College inasmuch as Plaintiff failed to show a substantial likelihood of success on the merits; he has not shown that he will suffer irreparable harm if the College continues to enforce its sexual harassment policy; the injunctive relief may result in harm to others; and the public interest will be served by denying the injunctive relief.

We wish to emphasize that in seeking to strike the appropriate balance here today, we have carefully considered the parties' respective interests and have not taken our task lightly. Just as we "hope that whenever we decide to tolerate intolerant speech, the speaker as well as the audience will understand that we do so to express our deep commitment to the value of tolerance – a value protected by every clause in the single sentence called the First Amendment[,]" *see* Edward J. Cleary, *Beyond the Burning Cross* 198 (1995) (quoting speech of Justice Stevens); we also hope that whenever we decide that intolerant speech should be restricted, it is understood that we do so with  no less commitment to the value of tolerance and the First Amendment in which it is enshrined.

Accordingly, for the above stated reasons, we **REVERSE** the district court's order granting Plaintiffs' motion for injunctive relief as to Plaintiff John Bonnell, and we **REMAND** the case for further proceedings consistent with this opinion.

reasonable basis for concluding as a matter of law that you are fostering a learning environment hostile to women, a form of sexual harassment. Federal and state law imposes a duty on the College to prevent the sexual harassment of its students and therefore requires that the College discipline you if it finds that you have created a hostile environment.

The principle of academic freedom under the 1st Amendment serves to protect the utterances in question only if they are germane to course content as measured by professional teaching standards. Since the precise frontier between academic freedom and sexual harassment remains to be defined by the courts case by case, a teacher of English literature or composition courses may be able to find safety and comfort under the 1st Amendment only if the words uttered are found in appropriate textual materials and the utterances are pertinent to discussion of those materials. Beyond this point, the teacher enters uncharted territory and proceeds at his or her own risk of being found guilty of sexual harassment. Consequently, you are warned that a general use in the classroom of words like 'fuck,' 'cunt,' and 'pussy' outside a professional exegesis may compel the conclusion that you are creating a hostile learning environment requiring disciplinary action.

(J.A. at 102.)

About eight months later, in November of 1998, a female student enrolled in Plaintiff's English 122 class, and filed a written "sexual harassment" complaint with the College ("the Complaint"), claiming that Plaintiff's classroom language constituted sexual harassment. (J.A. at 230.) The Complaint states in relevant part:

This is a letter of formal complaint against Professor John Bonnell. I am currently a student in Mr. Bonnell's class, English 122 from 8-9:30 PM on Mondays and Wednesdays. My complaint against Mr. Bonnell is sexual harassment. . . .

Beginning in middle to late September the atmosphere of the class started to change from comfortable to extremely offensive. Mr. Bonnell began using lude [sic] and obscene comments. These comments stemmed from English stories that we were reading in class, and he decided to add his own personal comments. These comments were dehumanizing, degrading, and sexually explicit. Some of the stories that were required reading revealed sexual innuendoes and implications. This should have been dealt with in a professional and appropriate manner, yet Mr. Bonnell displayed a lack of maturity, sensitivity, and responsibility, by taking advantage of the conversations to express his own previous sexual experiences. If this class had been a psychology or human sexuality class, I might have understood more of why sex was the major content of our class. This was supposed to be an English class and I feel cheated out of my money because I paid tuition to learn English. I did not pay to hear about Mr. Bonnell's sexual escapades. I feel that he also used his teacher position as a platform for authority to intimidate his students not to complain about him. Mr. Bonnell repeatedly made fun of students who had expressed offense or disgust and he also laughed at them. This is one of the reasons why I did not come forward sooner. I feel compelled to speak up now so as to save further embarrassment to Macomb Community College. I, as a student, and as a wife have been strongly affected mentally and emotionally due to the sexual harassment from Mr. Bonnell. My husband and I are fully prepared to take this sexual harassment complaint to the highest level of authority it can go.

My goals of filing this complaint is [sic] to, at the very least, receive credit for English 122, and a written apology from Mr. Bonnell. I also would like Mr. Bonnell to be dismissed from the college immediately. Mr. Bonnell also needs to go to a counselor to discuss his sexual problems. I would also like Mr. Bonnell to be denied all access to my and my husbands [sic] social

Moreover, without proper investigation of the sexual harassment Complaint, and appropriate response thereto, the College potentially compromises some of its funding. We do not find that Plaintiff's alleged harm outweighs the potential harm to others. *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 362 (6th Cir. 1998) (noting that the harm to the plaintiff's "First Amendment rights should the preliminary injunction not be issued must be weighed against the harm to others from the granting of the injunction").

Overall, the public interest would not be served in issuing the injunction. The very reason that allegations of sexual harassment inherently address a matter of public concern is because of the public interest in knowing that such goings on are properly investigated and not allowed to continue in any given arena. By issuing the injunction in this case, the district court usurped the College's attempt at maintaining a learning environment free of harassment and hostility in accordance with its sexual harassment policy. Again, we are not being asked to adjudicate the propriety of the College's sexual harassment policy. To the extent that the policy is in place, and that the College repeatedly warned Plaintiff that his actions were in violation thereof, we do not believe that the public interest was served by enjoining the College from enforcing its policy.

As we stated at the outset of this discussion, a preliminary injunction is reserved for only the most egregious case, and should not be extended to cases which are doubtful or do not come within well-established principles of law. *See Detroit Newspaper Publishers. Ass'n*, 471 F.2d at 876. Plaintiff's suspension without pay from his teaching position at a community college "commencing August 18, 1999 and ending December 18, 1999" wherein Plaintiff's fringe benefits remained in effect, did not rise to the level of requiring such extraordinary relief, particularly in a case such as this where it was not well-established whether the acts of expression for which Plaintiff was disciplined were protected under the First Amendment.

Apparently, the district court was attempting to show that because Plaintiff is not tenured, it is unlikely that he would succeed on his § 1983 claim for violation of his Fourteenth Amendment rights, absent a showing that his First Amendment rights were violated.  This is a correct proposition of law, *see Mt. Healthy,* 429 U.S. at 283-84, and would likely be true if Plaintiff could succeed on his First Amendment claim.  *See, e.g., Connection Distributing Co.,* 154 F.3d at 288.  However, we do not believe that Plaintiff has shown a substantial likelihood of succeeding on the merits of his First Amendment claim, and where the injury is purely economic in nature, a preliminary injunction is not necessary in any event. *See Celebrezze v. Nuclear Regulatory Comm'n,* 812 F.2d 288, 290 (6th Cir. 1987).  To that end, Plaintiff would not have suffered irreparable harm had the injunction  been denied insofar as the little more than four months' suspension Plaintiff received without pay was compensable with monetary damages.  Although Plaintiff contends that harm would have resulted without the injunction because his teaching style was being interfered with and his First Amendment rights were being violated, Plaintiff has not shown that his speech was protected by the First Amendment.

> **3.    Whether Issuance of Injunction Will Cause Harm to Others &**
> **4.    Whether Public Interest Would be Served by Issuance of the Injunction**

The district court found that the issuance of the injunction would not cause harm to the College, and that the public interest would be served by issuance of the injunction because the First Amendment interests of Plaintiff and the public would be advanced.  However, as we explained when balancing the parties' interests in this case, the injunction may cause harm to the students because without the College's enforcement of the sexual harassment policy and measures to protect its students from retaliation by a disgruntled professor, students may be forced to endure a hostile learning environment and may be intimidated into remaining silent.

security numbers, student accounts, address, and telephone numbers.  I expect and demand that this sexual harassment be taken seriously and given top priority.  Thank you for acting immediately and swiftly in this matter.

(J.A. at 230.)

As a result, Gus J. Demas, Dean of Arts and Science at the College, scheduled a meeting with Plaintiff to further investigate the matter, and also provided Plaintiff with a copy of the Complaint.  Plaintiff made copies of the Complaint and passed them out to the students in all six of his classes after redacting the complaining student's name, and also posted a copy of the Complaint on the bulletin board outside of his classroom.  At a December 3, 1998, investigatory meeting, MacQueen warned Plaintiff about disseminating the Complaint inasmuch as it is the College's policy that all student complaints be kept confidential.  However, Plaintiff did not heed MacQueen's warning and instead distributed copies of the Complaint to the more than two hundred College faculty members; attached to each copy of the Complaint was an eight-page satirical essay entitled "*An Apology: Yes, Virginia, There is a Sanity Clause"* ("the *Apology*") written by Plaintiff in response to the complaining student's sexual harassment Complaint. (J.A. at 232.)

Another meeting was held on December 18, 1998, which led to Demas issuing a memorandum to Plaintiff on January 5, 1999, entitled "Disciplinary suspension," which informed Plaintiff that he was suspended for three days, commencing February 1, 1999 and ending February 3, 1999. (J.A. at 108.)  The memorandum provides as follows:

> This memorandum is submitted as a statement of my finding that you used vulgar and obscene language without reference to assigned readings in your English 122 KR class during the fall 1998 term.  Specifically, I find:

1.   You made it a practice (as announced to the class at the start of the term) to swear in the classroom, using such words as 'shit,' 'damn,' 'fuck,' and 'ass.'

2.   In relating a newspaper account of an act of necrophelia, you said that one doesn't expect to receive a serious 'butt-fucking' after being dead for two weeks.

3.   In discussing President Clinton's relationship with Monica Lewinsky, you said that he received a 'blow job' from her.  This term was used by you twice.

4.   You remarked two or three times that "tits on a nun are as useful as balls on a priest."

In September, 1993 all faculty were informed that discipline will be imposed for the gratuitous and regular use of vulgar or obscene language in the classroom.  In February, 1996 all faculty were informed that classroom speech is insulated from the College's sexual harassment policy only if it is germane to course content as measured by professional standards.  In July, 1997 all faculty were informed that the "regular use of profane, vulgar, or obscene speech in the classroom which is not germane to course content (and thus educational purpose) as measured by professional standards will lead to the imposition of discipline."  In March, 1998, you alone were warned that "the principle of academic freedom under the First Amendment serves to protect the utterance [of words 'fuck,' 'cunt,' and 'pussy'] only if they are germane to course content as measured by professional standards and that "general use in the classroom of [these words] outside a professional exegesis may compel the conclusion that you are creating a hostile learning environment requiring disciplinary action."  In view of these warnings and the defiance you have expressed in face of them, you are to be suspended from your teaching duties without pay for three days, commencing February 1, 1999 and ending February 3, 1999.

### 2.   Whether Plaintiff Would Suffer Irreparable Harm Without the Injunction

When addressing this factor, the district court began by noting that "Sixth Circuit authority is clear that a nontenured teacher does not have a constitutional right to teach a particular class.  *See Parate v. Isibor,* 868 F.2d 821, 832 (6th Cir. 1989)." (J.A. at 134.)  After acknowledging this premise, the district court went on to state, without any supportive authority, that because Plaintiff "is a professor under continuing contract at MCC and indeed has been teaching there for 32 years, . . . he has a right to continued employment at MCC." (J.A. at 134.)  Then, relying upon *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977), the district court stated that "[a]lthough [Plaintiff] does not have a liberty interest in his teaching position, if he was suspended for First Amendment activities then he has established irreparable harm." (J.A. at 134.)

We find the district court's opinion misguided in this regard.  First, the district court takes the preliminary injunction factors out of sequence claiming that the irreparable harm inquiry is determinative; then the court finds, without any legal support, that because Plaintiff has been teaching under a contract for thirty-two years, he has a right to continued employment; then the court finds that Plaintiff does *not* have a liberty interest in his teaching position; and then the court goes on to say that despite the lack of a liberty interest in his teaching position, if Plaintiff can succeed in showing that he was suspended in violation of his First Amendment rights, he can show irreparable harm – which brings us right back to the first preliminary injunction factor which the district court should have considered at the outset.  To further complicate matters, the district court never addressed the harm that Plaintiff would allegedly suffer if the injunction was not granted.  It merely concluded that "[Plaintiff would] suffer irreparable injury if he was suspended for engaging in First Amendment activities."

*Fitzgerald,* 457 U.S. 800, 818 (1982).  The Court applies a two-part test to determine whether a government official is entitled to the affirmative defense of qualified immunity.  *See Summar v. Bennett,* 157 F.3d 1054, 1057 (6th Cir. 1998).  The first inquiry is whether the Plaintiff has shown a violation of a constitutionally protected right; and the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right.  *See id.* at 1058.

To determine whether a right was clearly established for purposes of qualified immunity, we "look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits."  *Chappel,* 131 F.3d at 579.  No decisions from the Supreme Court, our circuit, or any other court, clearly establish that Plaintiff's speech in the instant case was constitutionally protected so that Defendants would have understood that their disciplinary action violated Plaintiff's rights.   Thus, Defendants may be entitled to qualified immunity, and this could provide yet another basis for concluding that Plaintiff has not shown a substantial likelihood of success on the merits of his claim.  *See Cohen v. San Bernadino Valley Coll.,* 92 F.3d 968, 972-73 (9th Cir. 1996) (holding that the defendant community college board of trustees was immune from the plaintiff-teacher's § 1983 suit for violation of his First Amendment rights in relation to the discipline that the teacher received for responding to a student's sexual harassment claim because the defendants could not have reasonably known that the discipline violated an established right).

Having found that Plaintiff has failed to show a substantial likelihood of succeeding on the merits of his First Amendment claim, this preliminary injunction factor is thus dispositive of the issue, and we need not address the remaining three factors.  *See In re DeLorean Co.*, 755 F.2d at 1228.  However, because the district court made specific findings on the remaining factors, we shall do the same.

(J.A. at 231 (alterations in original).)[2]

On January 8, 1999, after becoming aware of Plaintiff's dissemination of the Complaint and other materials such as the *Apology,* MacQueen issued a memorandum to Plaintiff entitled, "Discussion of student complaints," which reads as follows:

Please be advised that the administration is aware of the distribution to faculty of your paper titled "An Apology: Yes, Virginia, There is a Sanity Clause" and intends to determine the extent of and means used in the distribution.

Because your posting, distribution and discussion of student complaints of sex harassment or your use of obscene or vulgar language conveys the message that complaining students may be expected to be ridiculed by you and ostracized by their classmates, and thus may be deterred from complaining, you are hereby directed not to post, distribute, or discuss verbally or in writing (inside or outside the classroom) specific complaints filed by one or more of your students against you regarding sex harassment or your use of obscene or vulgar language, or such complaints against you generally, with any person enrolled in one or more of your classes unless written permission has been granted by Dr. Rose Bellanca upon application of your union or attorney.  This prohibition extends to discussion of any disciplinary action which has or may be taken against you.

(J.A. at 240.)

In response to this directive, Plaintiff provided a copy of the redacted Complaint and the *Apology* to local television Channels 4 and 50, as well as to *The Macomb Daily* local

_____

[2]The memorandum bears the erroneous date of January 5, 1998, instead of January 5, 1999.

newspaper,[3] and also informed the students in his class that he had been suspended for three days. On the days of Plaintiff's suspension, nearly every student in all five of his classes did not attend class despite the fact that a substitute teacher was there to take Plaintiff's place. However, the students pre-signed attendance sheets indicating that they supported Plaintiff and were protesting his suspension.

On February 2, 1999, MacQueen notified Plaintiff that he was suspended with pay and benefits pending an investigation into Plaintiff's actions such as disseminating the Complaint to the news media, because such actions "[are] or may be causally related to disruption of the educational process." (J.A. at 340.) Thereafter, Plaintiff filed the instant suit.

In response to the disciplinary action taken by Defendants, Plaintiff filed a six-count complaint against Defendants on March 10, 1999. Count I alleged that Defendants conspired to violate Plaintiff's civil rights in violation of 42 U.S.C. § 1985 and § 1983; Count II alleged that Defendants violated Plaintiff's First Amendment rights to free speech and association, Sixth Amendment right to counsel, and Fourteenth Amendment right to due process and equal protection of the law; Count III alleged that Defendants were grossly negligent in violating Plaintiff's civil rights; Count IV sought a temporary restraining order to enjoin Defendants from enforcing their disciplinary suspension of Plaintiff; Count V alleged negligence and breach of the duty of fair representation against Defendant Mark Cousens in failing to represent Plaintiff as legal counsel on behalf of the union; and Count VI alleged loss of consortium. Plaintiff later amended the complaint to add the pendent state law claim of breach of contract against the Board of Trustees of the Community College District of the County of Macomb. Plaintiff also filed a motion for a preliminary injunction requesting his

---

[3] The district court duly noted that Defendants eventually divulged the complaining student's identity, with her permission; but that occurred only after Plaintiff distributed the student's redacted Complaint without her permission in violation of the College's policies.

prevent, and such a result would fail to consider the countervailing interests. *See* 18 BERKELEY J. EMP. & LAB. L. at 320 (["The First Amendment and] [a]cademic freedom must not be used to shield the abuse of a captive audience by racially or sexually derogatory epithets.").

Speech that rises to the level of harassment -- whether based on sex, race, ethnicity, or other invidious premise -- and which creates a hostile learning environment that ultimately thwarts the academic process, is speech that a learning institution has a strong interest in preventing. The line drawn as to whether a professor's speech rises to this level is to be decided on a case by case basis, and in the instant case Plaintiff is not challenging the constitutionality of the College's sexual harassment policy. Our task today is to balance the parties' respective interests under the facts of this case and, in doing so, we believe that the College's interest in preserving a learning environment free of sexual harassment, among others, outweighs Plaintiff's claimed free speech and academic freedom interests. As we acknowledged at the outset of this opinion, although this balance is a delicate one, we believe that the College's interests prevail under the facts and circumstances presented here.

### c.   Summary

The district court erred in concluding that Plaintiff demonstrated a substantial likelihood of succeeding on the merits of his First Amendment claim; although Plaintiff's speech addressed a matter of public concern, Plaintiff failed to show that his interests in speaking outweighed the College's interests in enforcing its policies.

It should be noted that Defendants' assertion of qualified immunity provides another basis as to why Plaintiff's claim may fail. It is well-established that the defense of qualified immunity grants government officials engaged in discretionary activities immunity from individual liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v.*

on public colleges and university campuses. . . . [H]owever, those rights are not absolute. The objectives that underscore the First Amendment also reflect and reinforce the educational mission of colleges and universities. These objectives include advancement of a representative democracy and self-government; the pursuit of truth in the marketplace of ideas; and the promotion of individual self-expression and development. Constitutional protection is afforded to the open and robust expression and communication of ideas, opinions, and information to further each of these objectives. This protection parallels a central mission of higher education: to nurture and preserve a learning environment that is characterized by competing ideas, openly discussed and debated.

Arthur L. Coleman & Jonathan R. Alger, *Beyond Speech Codes: Harmonizing Rights of Free Speech and Freedom from Discrimination on University Campuses,* 23 J.C. & U.L. 91, 98-99 (1996) (footnotes omitted).

In the matter before us, we believe that Defendants' purported interests, including maintaining the confidentiality of student sexual harassment complaints, disciplining teachers who retaliate against students who file sexual harassment claims, and creating an atmosphere free of faculty disruption, outweigh Plaintiff's purported interests. As noted by the several commentaries cited above, colleges and universities are legally required to maintain a hostile-free learning environment and must strive to create policies which serve that purpose. While a professor's rights to academic freedom and freedom of expression are paramount in the academic setting, they are not absolute to the point of compromising a student's right to learn in a hostile-free environment. To hold otherwise under these circumstances would send a message that the First Amendment may be used as a shield by teachers who choose to use their unique and superior position to sexually harass students secure in the knowledge that *whatever* they say or do will be protected. Such a result is one that a state college or university is legally obligated to

immediate reinstatement to his teaching position at the College.

The district court initially denied the motion for a preliminary injunction and remanded the matter to the College for an administrative hearing. Defendant William MacQueen, Vice President for Human Resources, presided over the May 25, 1999, hearing and on June 7, 1999 issued a memorandum finding "reasonable cause to believe that [Plaintiff] . . . violated Federal and Michigan law, College policies and directives, and the collective bargaining agreement between MCCFO and the College. In addition, there is reasonable cause to believe that you contributed improperly to the disruption of the educational process in your classes." (J.A. at 314.) The memorandum, entitled "Notice of charges," went on to specifically charge Plaintiff with 1) insubordination; 2) breach of confidentiality; 3) retaliation; and 4) disruption of educational process. *Id.* The memorandum concluded by informing Plaintiff that he was entitled to a hearing:

> Since a finding that you committed any of the violations alleged above (including disruption of the educational process) may lead to the imposition of discipline, you are entitled to a hearing before Dr. Rose Bellanca[, Provost,] at which you, your attorneys, and/or MCCFO may present evidence or argument in opposition to a conclusion that you committed them or that disciplinary action should be taken. Please have your attorneys or MCCFO representative inform Thomas P. Brady by June 18, 1999 whether you wish a hearing. If a hearing is not requested, Dr. Bellanca will proceed to a determination of these charges.

(J.A. at 316.) Plaintiff declined the invitation for a further hearing.

Subsequently, on July 9, 1999, Dr. Bellanca issued a memorandum to Plaintiff, entitled "Disciplinary Suspension," wherein Dr. Bellanca rendered her findings regarding the charges brought against Plaintiff, and concluded that Plaintiff

"breached confidentiality and retaliated against the complaining student." Dr. Bellanca went on to state that the College was imposing the following disciplinary action for Plaintiff's conduct:

As a result of your **disruption of the educational process**, you are hereby reprimanded and warned that any future actions which contribute to the disruption of the educational process at the College will subject you to further discipline.

* * *

As a result, the College finds you were **insubordinate** under the January 8 directive, and in light of the previous three-day disciplinary suspension which was issued to you, you are hereby suspended from your duties without pay for a period of fourteen calender days, commencing August 18, 1999, and ending August 31, 1999. Your fringe benefits will remain in place during the period of this suspension.

* * *

The College, therefore, finds you **breached confidentiality and retaliated against the complaining student.** In determining the appropriate discipline to be imposed for these offenses, the College has looked to the "Guidance" published by the Office of Civil Rights within the U.S. Department of Education and to case law. The OCR Guidance states that the school should tell the complainant that Title IX prohibits retaliation and that, if she or he is afraid of reprisals from the alleged harasser, the school will take steps to try to prevent retaliation *and will take strong responsive actions if retaliation occurs.* The College tried to prevent further retaliation by its directive to you of January 8, 1999, which you ignored. The College now feels obliged to take strong responsive action. Case law supports actions as severe as termination as being appropriate for breach of confidentiality.

maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy*, 354 U.S. at 250. However, the Supreme Court has also recognized that "[a]cademic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (citations omitted); *Sweezy*, 354 U.S. at 263 (Frankfurter, J. concurring) ("[The university atmosphere] is an atmosphere in which there prevail the four essential freedoms of a university -- to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.") (internal quotation marks omitted).

Similarly, this Court has recognized that the term academic freedom "'is used to denote both the freedom of the academy to pursue its end without interference from the government . . . and the freedom of the individual teacher . . . to pursue his ends without interference from the academy; and these two freedoms are in conflict.'" *See Parate v. Isibor*, 868 F.2d 821, 826 (6th Cir. 1989) (quoting *Piarowski v. Ill. Comm. College Dist. 515*, 759 F.2d 625, 629 (7th Cir. 1985)). Although the College is not claiming an interest in academic freedom *per se* in support of its position in the matter at hand, it is important to bear in mind that a professor's right to academic freedom is not absolute, and the "autonomous decisionmaking" of the College must be considered when balancing the parties' respective interests. *See Ewing*, 474 U.S. at 226 n.12.

### ii.   Balancing of the Interests

The balancing of interests between a faculty member's right to free speech and a college's or university's right in preserving its interests has recently been described as follows:

Free speech rights stemming from the First Amendment apply to both students and faculty members

brought pursuant to Title IX or pursuant to an internal sexual harassment policy. *See* Richard H. Hiers, *Academic Freedom in Public Colleges and Universities: O Say, Does that Star-Spangled First Amendment Banner Yet Wave?,* 40 WAYNE L. REV. 1, 48 (1993) (recognizing that teachers sanctioned for exercising what they believe to be constitutionally protected speech face the same legal hurdles of *Connick, Pickering,* and *Mt. Healthy*). This, along with the College's interests in maintaining the confidentiality of a student complaint as set forth in the CBA, protecting a complaining student from retaliation, and continuing its public funding are all interests which we find to be significant in "promot[ing] efficiency and integrity in the discharge of [the College's] official duties . . . ." *Connick*, 461 U.S. at 150-51 (internal quotation marks omitted).

Plaintiff claims that his interest in free speech under the First Amendment and his interest in academic freedom outweigh Defendants' purported interests. Academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603 (1967); *see also Shelton v. Tucker*, 364 U.S. 479, 487 (1960); *Sweezy v. N.H.*, 354 U.S. 234, 250 (1957) (plurality opinion). Although academic freedom is not "an independent First Amendment right," *see Bishop v. Aronov,* 926 F.2d 1066, 1075 (11th Cir. 1991), the Supreme Court has long recognized the significance of academic freedom:

The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new

The College gave serious consideration to terminating your employment effective immediately. However, in deference to your length of service with the institution, and in the belief that rehabilitation is still possible, the College has decided upon a suspension instead. Therefore, you are hereby suspended from your duties without pay for the four months of the Fall 1999 semester, commencing August 18, 1999 and ending December 18, 1999. This suspension will run concurrent with the fourteen day suspension issued for insubordination. In anticipation of your return to work in the Spring semester, your fringe benefits will remain in effect during the period of this suspension.

(J.A. at 425 (emphasis added).)

In response, Plaintiff filed a renewed emergency motion for preliminary injunction, upon which the district court heard testimony and oral argument on July 15 and 30, and August 3 and 19, 1999. On August 27, 1999, the district court issued its memorandum opinion and order granting Plaintiff's renewed motion for preliminary injunction. Plaintiff returned to his teaching position at the College on August 30, 1999.

Shortly after Plaintiff's return to the College, another student filed a complaint regarding Plaintiff's alleged profanity and offensive language used in the first night of class; his alleged denigration of the Jewish faith; and his alleged denigration of women. The student was so offended by Plaintiff's conduct, she demanded a full refund of her tuition for the class. The student stated that the only reason that she stayed throughout the entire class the first night was because she "did not want to take the chance of being caught in the crossfire of someone's rage. A feeling of uneasy nervousness overcame me. I felt trapped in the room for fear of getting up and causing a scene where he might humiliate me all the more." (J.A. at 493-94.) The student opined that "if you continue to employ this perverted man, I suggest that you put warning labels on all of the classes that he will be

teaching . . . which state '*extremely explicit language and sexual content*' on the course list each semester." *Id.*

Defendants now appeal from the district court's August 27, 1999, opinion and order granting Plaintiff's motion for a preliminary injunction and reinstating Plaintiff to his teaching position at the College.[4]

## DISCUSSION

### A.  Standard of Review  –  Preliminary Injunction

A preliminary injunction is an extraordinary measure that has been characterized as "one of the most drastic tools in the arsenal of judicial remedies." *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986); *see also Detroit Newspaper Publishers. Ass'n v. Detroit Typographical Union No. 18,* 471 F.2d 872, 876 (6th Cir. 1972) (emphasizing that a preliminary injunction is the strong arm of equity which should not be extended to cases which are doubtful or do not come within well-established principles of law).  We review the district court's decision to grant a preliminary injunction for an abuse of discretion while giving great deference to the district court's determination; however, our deference to the district court is not absolute. *Mascio v. Pub. Employees Ret. Sys.,* 160 F.3d 310, 312-13 (6th Cir. 1998).  Which is to say, the injunction will be disturbed if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard. *See Blue Cross & Blue Shield Mut. v. Blue*

---

[4]Plaintiff's period of suspension was over before this case was heard on appeal, despite the district court's issuance of the preliminary injunction; however, we find this matter justiciable in any event because the case involves an order "capable of repetition yet evading review." *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911); *see also Gannett Co. v. DePasquale*, 443 U.S. 368, 377 (1979) (finding that a matter is not moot when "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and there was a reasonable expectation that the same complaining party would be subjected to the same action again").

complaints, as expressly prohibited by the College's sexual harassment policy; 3) maintaining the confidentiality of a student complaint, as provided by Article VII.A.7. of the CBA between the College and Plaintiff's union, MCCFO; and 4) maintaining a learning environment free of faculty disruption, outweigh Plaintiff's interests which Defendants claim are negligible.

A college's or university's interest in maintaining a hostile-free learning environment, particularly as it relates to its Title IX funding, is well recognized.  However, the interests of allowing persons to speak freely in the college and university setting are equally as well-established such that the balancing of these interests is not an easy one where even the most revered universities struggle with creating a sexual harassment policy that preserves this delicate balance. *See, e.g.,* 18 BERKELEY J. EMP. & LAB. L. at 306-19 (noting the sexual harassment policies of various institutions including Stanford University and Harvard Law School). Organizations such as the American Civil Liberties Union ("ACLU") and the American Association of University Professors ("AAUP") recognize that limitations must exist on college professors' speech in order to provide a learning environment free of harassment; however, such organizations maintain that the limitations must be narrowly drawn so as not to compromise the professors' rights to academic freedom. *See id.* at 296-97. For example, the ACLU has opined that "[a] sexual harassment policy . . . in an academic setting must be drawn very narrowly . . . [where it is] limited to situations where a practice of . . . sexually derogatory comments is . . . so pervasive and abusive as to demonstrably hinder the learning experience." *Id.*

Although it is true that the complaining student in the case at hand filed her sexual harassment Complaint against Plaintiff with the College and not under Title IX, the College nonetheless took disciplinary action against Plaintiff in light of the College's policy against sexual harassment, and the same concerns thereby apply.  Indeed, the inquiry and the concerns are the same whether the sexual harassment claim is

the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *See Pickering,* 391 U.S. at 568. The district court failed to properly apply *Pickering* because the court never balanced the parties' respective interests; instead, the court appears to have assessed whether Plaintiff actually violated the College's sexual harassment policy by retaliating against the complaining student. Indeed, nowhere in the district court's opinion does it balance the interests involved; the court simply concludes that "[t]he issue is whether the First Amendment protects the publication of [Plaintiff's] *Yes, Virginia* memorandum attached to a copy of the sexual harassment complaint filed against him that redacts the name of the complainant and her class. The Court holds that it does. Based on content, form, and context of the distribution, [Plaintiff's] speech relates to matters of a public concern, and was not done in retaliation for a complaint of sexual harassment." (J.A. at 150.)

The district court misses the mark in its analysis and erroneously applies the relevant legal standard, which could possibly account for its erroneous decision to grant the preliminary injunction in this case. Specifically, the court failed to conduct a meaningful balancing of the interests involved in order to determine whether the College's interests in enforcing its policy outweighed Plaintiff's interests in speaking.

### i. Interests of the Parties Involved

Plaintiff claims that his interests in free speech and academic freedom outweigh the College's stated interests in regulating Plaintiff's speech. Defendants contend that their interests in 1) disciplining Plaintiff for conduct that threatened the College's eligibility for receiving federal funding under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g *et seq.,* which forbids the release of educational records and the release of personally identifiable information absent prior written authorization; 2) prohibiting retaliation against students who file sexual harassment

*Cross & Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir. 1997). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *See United States v. United States Gypsum, Co.,* 333 U.S. 364, 395 (1948).

With our review standard and the gravity of the relief in mind, we now address the district court's order in the case at hand granting Plaintiff injunctive relief.

### B. Analysis – Whether the District Court Properly Granted a Preliminary Injunction

In exercising its discretion with respect to a motion for a preliminary injunction, a district court must give consideration to four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir. 1998).

*Mascio*, 160 F.3d at 312-13. Federal Rule of Civil Procedure 52(c) "requires a district court to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue." *See In re DeLorean Co.,* 755 F.2d 1223, 1228 (6th Cir. 1985).

In *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the Supreme Court held that when reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated. In other words, the first factor of the four-factor preliminary injunction inquiry – whether the plaintiff shows a substantial likelihood of succeeding on the merits – should be addressed first insofar as a successful showing on the first factor mandates a successful showing on the second factor –

whether the plaintiff will suffer irreparable harm. *See id.; see also Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998) (finding that "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor"); *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. 1981) (holding that if the constitutional right of privacy is either threatened or in fact being impaired, this mandates a finding of irreparable injury). The district court erred in this regard because it considered the second preliminary injunction factor – whether Plaintiffs would suffer an irreparable injury without the injunction – first, claiming that this factor was dispositive.

**1.    Substantial Likelihood of Plaintiff Succeeding on His Civil Rights Claims Brought Against Defendants**

As a public employee, in order to establish a likelihood of success on his § 1983 claim that Defendants denied Plaintiff his First Amendment right to free speech, Plaintiff has to demonstrate that 1) he was disciplined for speech that was directed toward an issue of public concern, and 2) that his interest in speaking as he did outweighed the College's interest in regulating his speech. *See Connick v. Myers,* 461 U.S. 138, 147-50 (1983); *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968). The inquiry into whether Plaintiff's speech is entitled to protection under the First Amendment as addressing a matter of public concern is a question of law for the court to decide.[5] *See Rankin v. McPherson,* 483 U.S. 378, 383 & 386 n.9 (1987). The inquiry into whether Plaintiff's interests in speaking outweigh the College's interests in regulating Plaintiff's speech is a factual determination conducted under the well known *Pickering* balancing test. *See Pickering,* 391 U.S. at 568. If Plaintiff's interests in the prohibited speech outweigh the College's interests, then

---

[5]This inquiry remains the same whether the public employee was an untenured teacher. *See Dambrot v. Cent. Mich. Univ.,* 55 F.3d 1177, 1185 (6th Cir. 1995) (citing *Perry v. Sindermann,* 408 U.S. 593 (1972)).

where they are not germane to the subject matter, in contravention of the College's sexual harassment policy. *See id.; see also FCC v. Pacifica Found.,* 438 U.S. 726, 747 (1978) (finding speech that is "'vulgar,' 'offensive,' and 'shocking' . . . is not entitled to absolute constitutional protection under all circumstances"). This is particularly so when one considers the unique context in which the speech is conveyed -- a classroom where a college professor is speaking to a captive audience of students, *see Martin,* 805 F.2d at 586, who cannot "effectively avoid further bombardment of their sensibilities simply by averting their [ears]." *Hill,* 120 S. Ct. at 2489. Although we do not wish to chill speech in the classroom setting, especially in the unique milieu of a college or university where debate and the clash of viewpoints are encouraged – if not necessary -- to spur intellectual growth, it has long been held that despite the sanctity of the First Amendment, speech that is vulgar or profane is not entitled to absolute constitutional protection. *See Pacifica,* 438 U.S. at 747.

To summarize, although we find Plaintiff's classroom profanity that was not germane to the subject matter to be unprotected speech, we are also of the belief that Plaintiff's acts of expression in circulating the Complaint and the *Apology* were protected as addressing matters of public concern. Because parts of Plaintiff's speech for which he was disciplined addressed a matter of public concern, we are required to conduct a balancing of the parties' respective interests as set forth in *Pickering v. Board of Education. See Connick,* 461 U.S. at 149; *Rahn,* 31 F.3d at 411.

**b.    Was Plaintiff's Interest as a Citizen in Speaking on a Matter of Public Concern Greater than the College's Interest in Promoting the Efficiency of the Service that it Performs through its Employees?**

In *Pickering,* the Supreme Court developed a balancing test which weighed "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and

What the First Amendment does not do, however, is require the government as employer or the university as educator to accept this view as a valid means of motivating players. *An instructor's choice of teaching methods does not rise to the level of protected expression. . . .* The University has a right to disapprove of the use of the word "nigger" as a motivational tool just as the college in *Martin* was not forced to tolerate profanity.

55 F.3d at 1190-91 (citation omitted; emphasis added).

The *Dambrot* Court also rejected the coach's argument that his speech was protected under the realm of "academic freedom." 55 F.3d at 1188. "The analysis of what constitutes a matter of public concern and what raises academic freedom concerns is of essentially the same character." *Id.* (citing *Swank v. Smart*, 898 F.2d 1247, 1250 (7th Cir. 1990)). The Court then noted that the "linchpin of the inquiry is, thus, for both public concern and academic freedom, the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." To this end, the Court concluded that, unlike the case of *Levin v. Harleston,* 966 F.2d 85 (2d Cir. 1992), and *Jeffries v. Harleston,* 21 F.3d 1238 (2d Cir. 1994), *vacated and remanded,* 513 U.S. 996 (1994), *rev'd* 52 F.3d 9 (2d Cir. 1995) – where the speech of college professors who made derogatory comments about persons of certain racial or ethnic groups was found to serve the purpose of advancing viewpoints, however repugnant, which had as their purpose influencing or informing public debate – the coach's speech did not have such a purpose. *Id.* at 1189.

Turning to the matter at hand, just as a university coach may have the constitutional right to use the word "nigger," but does not have the constitutional right to use the word in the context of motivating his basketball players, *see* 55 F.3d at 1190; so too, Plaintiff may have a constitutional right to use words such as "pussy," "cunt," and "fuck," but he does not have a constitutional right to use them in a classroom setting

Plaintiff's First Amendment rights have been violated. *See Dambrot v. Cent. Mich. Univ.,* 55 F.3d 1177, 1186 (6th Cir. 1995). If the First Amendment violation was a substantial or motivating factor in Defendants' disciplinary action against Plaintiff, Defendants may present evidence that they would have disciplined Plaintiff in the absence of his protected conduct. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285 (1977). However, if Plaintiff's speech does not involve a matter of public concern, it is unnecessary for the court to scrutinize the reason for the discipline. *See Connick*, 461 U.S. at 146.

Many commentators have recently addressed the degree of protection that should be afforded speech in the college and university setting, particularly in reference to protected speech as it relates to the prohibition of sexual harassment under Title IX, 20 U.S.C. § 1681.[6] *See, e.g,* Lisa M. Woodward, Comment, *Collision in the Classroom: Is Academic Freedom a License for Sexual Harassment?,* 27 CAP. U. L. REV. 667 (1999); Beverly Earle & Anita Cava, *The Collision of Rights and a Search for Limits: Free Speech in the Academy and Freedom from Sexual Harassment on Campus,* 18 BERKELEY J. EMP. & LAB. L. 282 (1997); Arthur L. Coleman & Jonathan R. Alger, *Beyond Speech Codes: Harmonizing Rights of Free*

---

[6] Title IX of the Education Amendments of 1972 was enacted to supplement the Civil Rights Act of 1964's ban on discrimination in the workplace, *see Yusuf v. Vassar Coll.,* 35 F.3d 709, 714 (2d Cir. 1994), and requires that educational institutions that receive federal funds provide a learning environment free of sex discrimination, including sexual harassment. *See* 20 U.S.C. § 1681(a)(1), (8); (c). Courts have interpreted Title IX cases under Title VII standards. *See, e.g., Brine v. Univ. of Iowa,* 90 F.3d 271, 276 (8th Cir. 1996); *Murray v. N.Y. Univ.,* 57 F.3d 243, 249 (2d Cir. 1995) ("[I]n a Title IX case for gender discrimination based upon the sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII."); *Preston v. Commonwealth of Va. ex rel. New River Cmty. Colls. & Occupational Educ.,* 813 F.2d 311, 316-17 n.6 (10th Cir. 1987). However, the Supreme Court has reserved the question as to whether Title IX actions are governed by Title VII standards. *See Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 65 n.4 (1992).

*Speech and Freedom from Discrimination on University Campuses,* 23 J.C. & U.L. 91 (1996).   Indeed, as one commentator has noted:

Currently, a debate rages concerning the degree to which speech that is sexually or racially harassing is protected.  And nowhere is that debate more heated than on university campuses, historically committed to unrestricted inquiry and exploring of ideas, yet morally obligated to promoting respect, and legally forbidden from permitting sexual harassment under Title VII and Title IX.

18 BERKELEY J. EMP. & LAB. L. at 283 (footnotes omitted).

The Supreme Court has similarly recognized the unique protection afforded speech generally in the academic realm:

Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance.  But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1, 69 S. Ct. 894, 93 L. Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom -- this kind of openness -- that is the basis of our national strength and of our independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.  Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of a school,' the prohibition cannot be sustained. *Burnside v. Byars,* [363 F.2d 744,] 749 [(5th Cir. 1966)].

to use profanity in the classroom; and the Fifth Circuit agreed. *See id.* at 585.  The Court held that the teacher's speech did not touch upon a matter of public concern because the profanity served only to reflect the teacher's attitude toward his students. *Id.*  In connection with its holding, the Court recognized that the students were a "captive" audience, and that they "paid to be taught and not vilified in indecent terms . . . ." *Id.* at 586.  In short, the Court held that the teacher's "language is unprotected . . . because, taken in context, it constituted a deliberate, superfluous attack on a 'captive audience' with no academic purpose or justification." *Id.*

In *Dambrot v. Central Michigan University,* we relied upon the Fifth Circuit's decision in *Martin* when we held that the coach of a state university basketball team did not engage in protected speech when he used the word "nigger" during a locker room session allegedly to motivate his basketball players. *See* 55 F.3d 1177, 1180 (6th Cir. 1995) ("[Y]ou know we need to have more niggers on our team . . . . Coach McDowell is a nigger, . . . .  Sand[er] Scott who's an academic All-American, a Caucasian, I said Sand[er] Scott is a nigger.  He's hard nose, [sic] he's tough, et cetera.").  The coach was discharged by the university for this speech and he filed suit alleging that his discharge violated the First Amendment.  The district court granted the university's motion for summary judgment and this Court affirmed. Relying upon *Martin*, the Court concluded as follows:

The First Amendment protects the right of any person to espouse the view that a "nigger" is someone who is aggressive in nature, tough, loud, abrasive, hard-nosed and intimidating; someone at home on the [basketball] court but out of place in a classroom setting where discipline, focus, intelligence and interest are required. This same view has been and is held about African Americans by many who view the success of Black athletes as a result of natural athletic ability and the success of Black executives as the result of affirmative action.

[T]he protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it. Indeed, it may not be the content of the speech, as much as the deliberate verbal or visual assault, that justifies proscription. Even in a public forum, one of the reasons we tolerate a protestor's right to wear a jacket expressing his opposition to government policy in vulgar language is because offended viewers can effectively avoid further bombardment of their sensibilities simply by averting their eyes.

*Hill v. Colo.*, 530 U.S. 703, 120 S. Ct. 2480, 2489 (2000) (citations and internal quotation marks omitted). Nearly a century before *Hill* was decided, Justice Holmes likewise opined that "the character of every act depends upon the circumstances in which it was done. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that have all the effect of force." *See Schenck v. United States,* 249 U.S. 47, 52 (1919) (citations omitted).

The degree of protection afforded to a college professor's speech in the context of the classroom was addressed by the Fifth Circuit in *Martin v. Parrish*, 805 F.2d 583, 584-85 (5th Cir. 1995). There, the plaintiff was discharged from his teaching position at a college for his incessant use of profanity in the classroom. *Id.* In finding that the speech was not protected, the Fifth Circuit took into account the unique context in which a college professor speaks such that his students are a "captive audience" who may find themselves intimidated by the person who has the ability to pass upon them a poor grade. Specifically, in *Martin* the plaintiff teacher denigrated his students with profanity such as "bullshit," "hell," "damn," "God damn," and "sucks," allegedly because the students had a poor attitude. The plaintiff brought a § 1983 claim against the college for violation of his First Amendment rights; the district court held that the plaintiff did not have a constitutionally protected right

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508-09 (1969); *see also Shelton v. Tucker,* 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.").

In the matter at hand, although we ultimately agree with the district court that Plaintiff's speech was protected as addressing a matter of public concern, the district court made erroneous factual determinations and legally incorrect rulings in rendering its decision which should be noted for the record. Moreover, the district court erred when it found that Plaintiff's interests in speaking as he did outweighed the College's interests in prohibiting retaliation against students who file sexual harassment complaints, maintaining the confidentiality of its students, maintaining a disruption-free environment, and maintaining its federal funding.

### a. Was Plaintiff's Speech Protected as Addressing a Matter of Public Concern?

At this juncture, we turn to our analysis of Plaintiff's speech and why we find that a portion of the speech addresses a matter of public concern.[7] Plaintiff's distribution of the *Apology* along with the student's sexual harassment Complaint to his students, fellow faculty members, and the

---

[7]The concurrence claims that there is an absence of clear guidance from the Supreme Court as to how *Connick v. Myers* is to be applied in a "mixed speech" case, and that the appropriate course of analysis is to simply assume that Plaintiff's speech was protected. However, contrary to this assertion, *Connick v. Myers* was itself a mixed speech case which in fact provides clear guidance. There, the Court looked at every act of expression, and only after concluding that one of the acts touched upon a matter of public concern, balanced the interests involved. *See* 461 U.S. at 146-49. In doing so, the Court made note of its "responsibility . . . to ensure that citizens are not deprived of fundamental rights by virtue of working for the government . . . ." *Id.* at 147. Accordingly, we would be remiss if we based our analysis upon assumptions rather than the true nature of Plaintiff's speech. *See id.* at 150 (finding that "the state's burden in justifying a particular discharge varies upon the nature of the employee's expression").

media, as well as his use of classroom language considered to be obscene and not germane to the course content, are the acts of expression for which he was disciplined and thus are at issue here.[8]    *See Johnson v. Lincoln Univ. of the Commonwealth Sys. of Higher Educ.*, 776 F.2d 443, 451 (3d Cir. 1985) ("It is implicit in *Connick* that the court must examine each activity which the employee claims provided the actual motivation for his termination to see whether it 'touch[es] . . . upon a matter of public concern.'") (quoting *Connick*, 461 U.S. at 149) (alteration in *Johnson*).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. Speech which can be "fairly considered as relating to any matter of political, social, or other concern to the community" touches upon matters of public concern.    *See id.* at 146.    Absent unusual circumstances, a public employee's speech dealing with "matters only of personal interest" is not afforded constitutional protection. *See id.* at 147. However, mixed questions of private and public concern, where the employee is speaking both as a citizen as well as an employee, can be protected, *see Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000), such that "if any part of an employee's speech, which contributes to the [disciplinary action], relates to a matter of public concern, the court must conduct a balancing of interests test as set forth in *Pickering v. Board of Education,* 391 U.S. 563 (1968)." *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412 (6th Cir. 1994); *see also Connick*, 461 U.S. at 147 (finding that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only

---

[8]The district court failed to consider Plaintiff's classroom speech in the course of issuing the preliminary injunction; however, Plaintiff's classroom speech must be considered where the parties have raised the issue, and where Plaintiff's classroom speech was precipitous of the Complaint and Plaintiff's resulting actions which led to the disciplinary measures.

issue is what the College terms profanity not "germane to course content."[10]    *See, e.g.,* March 4, 1998 Memorandum from MacQueen to Plaintiff entitled "Obscene and vulgar speech" (cautioning Plaintiff that "[u]nless germane to discussion of appropriate course materials and thus a constitutionally protected act of academic freedom, your utterance in the classroom of such words as 'fuck,' cunt,' and 'pussy' may serve as a reasonable basis for concluding as a matter of law that you are fostering a learning environment hostile to women, a form of sexual harassment"). In other words, it was not the content  of Plaintiff's speech itself which led to the disciplinary action; rather, it was the context and form in which Plaintiff used the speech -- i.e., in the course of his teaching where the language was not germane to the course content -- that the College found to be in violation of its sexual harassment policy.

The context in which a message is delivered is often the pivotal factor when determining whether the speech will be protected.  As the Supreme Court recently opined:

---

[10]The College's sexual harassment policy provides in relevant part:

For purposes of this policy, the term "sexual harassment" means . . . unwelcome verbal . . . conduct or communication of a sexual nature when: . . . (b) Such conduct or communication has the purpose or effect of unreasonably interfering with an individual's employment or education by creating an intimidating, hostile, abusive, or offensive work or educational environment.

This policy does not apply to speech protected by the Constitutions of the United States or the State of Michigan. The academic setting is distinct from the workplace in that wide latitude is required for professional judgment in determining the appropriate content and presentation of academic material. Thus, speech in the classroom which is germane to course content is not subject to this policy. Reasonable care must be exercised in applying this policy to avoid violation of 1st Amendment rights.

(J.A. at 355.)

complained about "a few male chauvinistic P.E. teachers." *Id.* Before the teacher's satirical response was published in the school newspaper, both the paper's faculty advisor as well as the school's principal read the letter and did not object to it. *Id.* In addition to being published in the school paper and distributed to the students at the high school, the letter was mailed to approximately 3,600 families in the school's community. *Id.* at 1580.

After distribution, the principal informed the teacher that he had received complaints from the community, faculty members, and others. *See id.* The principal also stated that the teacher may receive a "needs improvement" rating in "Professional Responsibility" on his evaluation, and suggested that the teacher meet with the human relations committee and write a letter of apology to the newspaper. *Id.* The teacher complied on both measures. *Id.* However, in his performance evaluation, the teacher received the "needs improvement" rating, despite his letter of apology, and did not receive his wage step increase. *Id.* at 1580-81. The teacher filed suit alleging violation of his First Amendment rights. *Id.* The district court held for the school on the basis that the speech did not involve a matter of public concern, but the Fourth Circuit reversed. *Id.* at 1582. The Fourth Circuit found that the teacher's letter involved a matter of public concern because it addressed the issue of sex discrimination in the physical education department, or the treatment of females in school programs. *Id.* at 1583. Accordingly, it follows that Plaintiff's *Apology*, which addressed an allegation of sexual harassment, and therefore the treatment of females at the College, similarly addressed a matter of public concern. Moreover, in the case at hand, the *Apology* went one step further and addressed issues of public concern such as the sanctity of the First Amendment.

### iii. "Classroom Language"

Finally, we turn to Plaintiff's classroom language which gave rise to the sexual harassment complaint and the disciplinary measures. The content of Plaintiff's language at

of personal interest," no First Amendment protection is afforded to the speech); *Johnson*, 776 F.2d at 451 (finding that the fact that a statement evolves from a personal dispute does not preclude some aspect of it from touching upon matters of public concern).

We find the case at hand to be a mixed speech case inasmuch as Plaintiff's speech at issue concerns both private as well as public matters. Stated otherwise, although aspects of Plaintiff's speech involve matters of personal interest where he is speaking regarding a personal grievance as an employee, his speech also involves matters of public interest such that Plaintiff is speaking as a concerned citizen. "Mixed speech cases are perhaps the most difficult subset of employee speech cases to adjudicate. Because the employee admittedly speaks from multiple motives, determining whether she speaks as a citizen or employee requires a precise and factually-sensitive determination." *Kennedy*, 224 F.3d at 367. However, "[w]hether an employee's statement is predominated by 'the employee's personal interest qua employee' is primarily a content-based inquiry, not an exclusively motive-based inquiry." *Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 575 (6th Cir. 1997). In other words, "'[t]he motive which underlies an employee's statements is a relevant, but not necessarily dispositive factor' when considering whether an employee's statements may be fairly characterized as relating to any matter of political, social, or other concern to the community." *Id.* at 576 (quoting *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 409 (7th Cir. 1994)).

### i. "The Complaint"

One of the acts of expression for which Plaintiff was disciplined was his distribution of the sexual harassment Complaint lodged against him. Regarding the content of the Complaint, it is well-settled that allegations of sexual harassment, like allegations of racial harassment, are matters of public concern. *See Connick*, 461 U.S. at 146 (noting that "it is clear that . . . statements concerning the school district's

allegedly racially discriminatory policies involved a matter of public concern") (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979)); *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1269 (5th Cir. 1992) (finding that "reports of sexual harassment perpetrated on [the plaintiff] and other women at [the University of Texas Health Center] – is of great public concern"); *see also Perry v. McGinnis*, 209 F.3d 597, 608 (6th Cir. 2000) (finding that because the plaintiff's complaint was for race discrimination, it inherently involved a matter of public concern). It is true that the plaintiff alleging a First Amendment violation is usually the person who lodged the sexual or racial harassment complaint, claiming that the employer retaliated against him for filing the complaint; while in the case at hand, it is the person against whom the complaint was made who is claiming a First Amendment violation. However, the lack of parallelism between Plaintiff in this case and the plaintiffs in other cases does not change the fact that the Complaint related to sexual harassment and therefore involves a matter of public import.

The context and form of Plaintiff's speech in this regard require further inquiry. Plaintiff's expression of circulating the sexual harassment Complaint came on the heels of his being called before the College to answer to the allegations made by the complaining student regarding Plaintiff's classroom conduct. Although Plaintiff may have circulated the Complaint in the context of a heated dispute with the College and out of personal animus in retaliation against the complaining student, the fact remains that the context of his circulating the Complaint to faculty members, students, and the media is a matter of public concern where the public – particularly other students attending and planning to attend the College – certainly would be interested in learning the nature of the sexual harassment Complaint lodged against Plaintiff. *See Moore v. City of Kilgore*, 877 F.2d 364, 370-71 (5th Cir. 1989) (finding that the plaintiff's criticism of the fire department to the media addressed a matter of public concern, although the criticisms may have been borne out of the plaintiff's personal disagreement with the fire department's staffing problems, because the public was eager to hear about

addressed a matter occurring at the college which was of public concern.

In *Perry v. McGinnis*, this Court recently rejected the argument that because the plaintiff brought his race discrimination complaint in the context of an internal grievance with his employer, the complaint did not address a matter of public concern. *See* 209 F.3d at 608. The *Perry* Court noted that in *Chappel* we clarified that "[t]he fundamental distinction recognized in *Connick* is the distinction between matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives." *Id.* (citing *Chappel*, 131 F.3d at 575) (citing *Azzaro v. County of Allegheny*, 110 F.3d 968, 979 n.5 (3d Cir. 1997) (*en banc*)). Accordingly, the *Perry* Court went on to conclude that "whether Perry's racial discrimination complaint was borne out of civic-minded motives or of an individual employment concern is irrelevant. What is relevant is that the subject of Perry's complaint was racial discrimination – a matter inherently of public concern, according to the Supreme Court." 209 F.3d at 608-09 (citing *Connick*, 461 U.S. at 148 n.8). And so it goes that in the case at hand, although Plaintiff may have circulated the *Apology* in the context of a self-serving motive, it nonetheless remains that the subject of the *Apology* – classroom language by a college professor which led to the filing of a sexual harassment complaint by one of his students for which he was disciplined, all in relation to the First Amendment – inherently touches upon a matter of public concern.

We are further persuaded in this regard by the Fourth Circuit's opinion in *Seemuller v. Fairfax County Sch. Bd.*, 878 F.2d 1578 (4th Cir. 1989). There, a high school physical education teacher alleged that his First Amendment rights were violated when he did not receive his wage step increase because he wrote a satirical letter to the school newspaper commenting on allegations of sex discrimination against female students by teachers in the physical education department. *See id.* at 1579. Specifically, the teacher was responding to a letter in the school newspaper which

to be a matter of public concern does not turn on communication of the speech to the public, *see Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 585 (6th Cir. 2000), and that a "finding of public concern is . . . strengthened by the fact that the plaintiff did not solicit the attention of the media, but simply responded to questions regarding the existing controversy," *see Matulin v. Vill. of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988), we believe that Plaintiff's circulation of the *Apology* was in the context of bringing the issue to the fore as a matter of public interest.

The district court found – by virtue of its own devices and not based upon Plaintiff's testimony – that Plaintiff's motivation, or the context in which he circulated the *Apology*, was to discuss the bounds of the First Amendment, which thereby rendered Plaintiff's speech a matter of public import. We have two concerns regarding the district court's assessment. First, as noted, a speaker's underlying motivation in expressing himself as he did, although relevant, is not dispositive of the issue of whether the act of expression addresses a matter of public concern. *See Chappel*, 131 F.3d at 574. Second, we do not believe that the record supports a finding that Plaintiff's motivation in circulating the *Apology* was necessarily only one of public interest.

Based upon the nature of the *Apology,* one could conclude that Plaintiff was motivated by personal animus against the complaining student as well as against the College for its reaction to her Complaint, and that he circulated the *Apology* as a retaliatory gesture against these parties. Indeed, in the *Apology* Plaintiff states that until the formal Complaint had been lodged against him, he had ignored similar complaints made by students. In other words, until the formal complaint was filed and the College acted upon it, Plaintiff did not react to similar complaints made by students, suggesting that Plaintiff's reaction in this case was simply in response to his discontent with the College's discipline. However, even assuming that Plaintiff was motivated by personal animus in circulating the *Apology*, the fact remains that in doing so, he

the ability of the fire department to perform its duties). Accordingly, we believe that Plaintiff's distribution of the Complaint involved a matter of public concern such that the act of expression was protected under the First Amendment. *See id.*

The district court likewise found that Plaintiff's distribution of the redacted Complaint was protected as a matter of public concern inasmuch as the content, context, and form of the expression dealt with the issue of sexual harassment, and we do not take issue with the district court's findings or holding in this regard. However, the district court's factual findings regarding Plaintiff's distribution of the *Apology* presents a different case where, although the court ultimately reached the correct conclusion of law, the court's findings were clearly erroneous.

### ii.    "The Apology"

The district court could not be more incorrect when it found that "[t]he entire eight page *Yes, Virginia* memorandum does not state that the student had filed a sexual harassment complaint against Bonnell, or even use the term sexual harassment. It is totally directed toward a discussion of the English language." (J.A. at 146.) One need look no further than the second paragraph of the *Apology* to find the term "sexual harassment" used, and the *Apology* opens in the first paragraph with a salutation to "Young lady," – obviously in reference to the complaining student – as well as with a reference to the apology that she sought from Plaintiff for his allegedly harassing conduct. (J.A. at 103.) Specifically, the *Apology* states as follows:

Young lady, before identifying the clause in the title, and as a preface to the ***apology*** that you desire, let me review the two articles of impeachment which you have preferred against me. First, there is the one count of buttfucking; second, there are the three counts of blow-job. The first charge all by itself, I must confess, would inspire squeals of protest even from the most asinine, the most cheeky. The second charge, on the face of it, is

more than your average mouthful. I marvel at your courage in bringing notice of these alleged outrages to the proper authority, and I am amazed by the modest remedy you require.

In short order, I was summoned before the college's highest tribunal where the grand inquisitor himself, with the support of sundry assistants, subjected me to rigorous cross-examination. I was not informed beforehand as to the specifics of this interrogation, apparently because the examiners were after the truth of the matter and probably felt that the element of surprise would tend more profitably to that end. Professors are rather like politicians: give them ample time to consider any question, they are apt to expatiate *ad nauseam*. I *did* know, because of your ***"formal complaint," what the fundamental charge might be: sexual harassment.*** But, as that might be anything from gang rape by a branch of the Hell's Angels to an indiscreet plucking at one's own wedgie, I couldn't imagine what witches' spew might be brewing.

(J.A. at 103 (emphasis added).) Indeed, contrary to the district court's finding, the *Apology* is explicitly directed toward the complaining student, as the salutation indicates and as the entire exposition reiterates. Throughout the entire eight-page *Apology*, Plaintiff continually refers to the complaining student as "Virginia," and does so with mockery, disdain, and insults as to her immaturity in bringing the sexual harassment Complaint against Plaintiff. For example, Plaintiff states as follows on the fourth page of the *Apology*:

It is true – this is your half of a truth – that I talked about previous hassles with the college administration over some students "lining up" (an obvious exaggeration for comic effect) at some dean's office to complain about the "bad man" with the "potty mouth." And, yes, a semester or more after the fact, I probably dismissed such folks (especially the cowards, the ones who never broach their disaffection in class or at any time to my face) with

Oh! – the sanity clause! Virginia, I almost forgot! Here it is: "Congress shall make no law . . . abridging the freedom of speech . . . ." This has driven the thought police, the language censors, and all deputy inquisitors beyond despair, into madness. If I had access to your Christmas stocking, I would stuff it there. When, at length, you grow up, you will cherish it above every other gift, save love itself. Cheers.

(J.A. at 107.)

As noted at the outset of our analysis, the debate of constitutionally protected speech in the classroom setting -- particularly as it relates to sexual harassment and a college's obligations under Title IX -- is a heated one where the most learned of academic institutions struggle to find a common ground. Therefore, speech which sets forth the type of remarks that served as the catalyst to a sexual harassment complaint lodged against a college professor, and the professor's reaction thereto, is speech which can "fairly be considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146 & 147-48. Said differently, the subject of profane classroom language which precipitates a sexual harassment complaint lodged against the instructor for his use of this language in relation to the First Amendment, as well as the sanctity of the First Amendment in preserving an individual's right to speak, involves a matter of public import. *See Wilson*, 973 F.2d at 1269. Stated more broadly, there is a public interest concern involved in the issue of the extent of a professor's independence and unfettered freedom to speak in an academic setting.

The context and form of Plaintiff's circulation of the *Apology* was public in nature such that Plaintiff distributed the *Apology* to the College's more than two hundred faculty members as well as to two local television stations and a local newspaper, thereby bringing to light the subject of allegedly profane classroom language which led to the filing of a sexual harassment complaint. Although it is true that finding speech

right, and wrong, altogether.), and obscenity (this one's a doozy, too. "Inciting lustful feelings; lewd," is the second definition. The other applications are reminiscent of "vulgar." The only persons in my classes who are stirred, in any antisocial sense, by my diction are either the very unfortunately "wired," on the one hand, or the very young, Virginia, on the other.) – all these are in the eye of the beholder. That's why even so august a body as the U.S. Supreme Court has continually tied itself into comical knots trying to sort out the sordid, parse the putrid, and teet the totter. That which is "germane to course content" is best left to the professional (more on "academic freedom" later), while "imposition of discipline" is reserved for the amusement of inquisitors.

(J.A. at 103-04.)

A review of the *Apology* also indicates that Plaintiff was speaking as a concerned citizen about the importance of the right to free speech under the First Amendment, and the need to protect that right in society. For example, Plaintiff wrote as follows:

So, then to conclude this my *apologia*. I am sorry, almost ineffably sorry, that you find our language, the English language, so painful. You will never have the power, of course, to restrict it, or to kill part of it, as you wish. Nor am I possessed of the tongue of men and of angels, so as to protect it from you or all the tribe of its detractors. It will continue to wend its way and may even find complete vindication, one day, from its shaky jurisprudential custodians. I will probably not see that day, as it lies somewhere beyond the frenetic millennial epoch. But you may. Hopefully, by then, you will have learned to appreciate it. Maybe, then, you will understand that life without the fullness of your language's energy would be like that life Khalil Gibran says languishes without love: life where you may still laugh, but not all of your laughter; where you may still cry, but not all of your tears.

a gibe, a jeer, a hiss of derision. I tend to get a tad defensive when people don't just disagree with me, my values, my behavior, but who would also campaign for and delight in my utter destruction. Disagreement is fine; I welcome it and always remember to reward it. The clash of ideas and values is usually both exciting and illuminating. But I have never "dressed down," attacked, insulted, or ridiculed any actual student in any actual class. And you know that; you know there can be no corroboration for your arrant lie. (Shame on you, Virginia – so very young and yet so devious).

(J.A. at 106.) Also replete throughout the *Apology* is the phrase, "I am sorry, Virginia, that you find your own language, the English language, so painful," again directed at the complaining student in reference to the fact that she filed a sexual harassment complaint against Plaintiff for his use of profanity which she found so offensive that it allegedly created a hostile learning environment. (J.A. at 104, 105, 107.) It is not until that last paragraph of the *Apology* that Plaintiff identifies the First Amendment, or as Plaintiff coins it, the "sanity clause." (J.A. at 107.) Accordingly, the district court's finding that the *Apology* is "totally directed toward a discussion of the English language" is clearly erroneous where a review of the *Apology* on its face does not support this finding.

Based upon its previous finding that the *Apology* never once mentions the term sexual harassment and is "totally directed toward a discussion of the English language" – the district court went on to find that "[t]his indicates that Bonnell's motive in writing the *Yes, Virginia* memorandum was not to retaliate for a sexual harassment complaint, but instead to discuss First Amendment concerns in the context of classroom language." (J.A. at 147.) However, at the time of the preliminary injunction hearing, the district court ruled that Plaintiff's motivation in writing the *Apology* was irrelevant and he refused to allow Plaintiff to be questioned

regarding his motivation.[9]  Then, despite the court's finding to the contrary, in discerning Plaintiff's motive, the district court also found it "important" that at the time Plaintiff wrote the *Apology,* the Complaint had been decided in his favor. Apparently, the district court was of the opinion that because the outcome of the student's claim against Plaintiff had been decided in his favor, Plaintiff could not have been motivated by retaliation in writing the *Apology*.  However, Plaintiff expressly states in the *Apology* that he was on the "defensive" because of the Complaint lodged against him, and Plaintiff expressly testified that at the time he wrote the *Apology*, he did not know the outcome of the sexual harassment Complaint. (J.A. at 107, 697.)  Furthermore, Plaintiff could have sought to retaliate against the student and the College regardless of the actual outcome of the matter.

The district court then based its conclusion of law that Plaintiff's *Apology* was protected under the First Amendment as a matter of public concern on its finding that Plaintiff's motive in writing the *Apology* was to discuss the First Amendment in the context of classroom language. However, as previously indicated, an employee's motivation in speaking is not dispositive as to whether the speech was protected, thereby making the district court's basis for its conclusion of law erroneous. *See Chappel*, 131 F.3d at 574 (finding that "the argument that an individual's personal motives for speaking may dispositively determine whether that individual's speech addresses a matter of public concern [to be] plainly illogical and contrary to the broader purposes of the First Amendment").  And, also as indicated, the district court refused to allow Plaintiff to be questioned as to his

---

[9] A sampling of the colloquy provides as follows:
Q. (to Plaintiff)  Why did you write the document [the *Apology*]?
    MR. WENDT:    Same objection.
    MR. MATEO:    They are saying retaliation.  It is relevant for this witness who wrote the document to tell us why.
    THE COURT:    I don't think it is relevant.  The document speaks for itself. . . . I will sustain the objection.
(J.A. at 699.)

motive in writing and distributing the *Apology* on the basis that Plaintiff's motive was "not relevant."

Despite these erroneous factual findings and the erroneous legal premise upon which the court based its conclusion of law, we believe that the district court properly concluded that Plaintiff's speech was protected under the First Amendment because the *Apology* – although expressed as a satirical diatribe fraught with references to Plaintiff's personal disagreement with the student's characterization and reaction to his classroom language – addressed a matter of public concern.

Regarding the content of the *Apology*, it is true that Plaintiff apparently crafted the title in response to the remedy sought by the complaining student; that he addresses the *Apology* to the complaining student, albeit under the pseudo-name "Virginia" in order to create a sarcastic spoof on the editorial, "*Yes, Virginia, There is a Santa Claus*;" and that he criticizes both the student and the sexual harassment Complaint that she filed against him, as well as the College's disciplinary measures taken in response to the Complaint, all in relation to the First Amendment – which Plaintiff describes as "the Sanity Clause."  While the content of the *Apology* appears to be a personal attack on the various parties involved, the content also addresses the College's sexual harassment policy as it relates to classroom language.  For example,

> It says, after all, in the cover letter to the college's "Revised sexual harassment policy" (July 30, 1997) that "Regular use of profane, vulgar, or obscene speech in the classroom which is not germane to course content (and thus educational purpose) as measured by professional standards will lead to the imposition of discipline."

> But you see, Virginia, this sort of legalese is variantly known in the grown-up, adventitiously sane, world as bullshit. Profanity, vulgarity (I'm especially fond of this one, since it ensnares virtually everyone in its aristo-analcratic web; look it up, and you'll see what I mean. You will think: "sump'n' ain't right here," and you'll be